Good morning, may it please the court, I'm Richard Ferrer from the Texas Solicitor General's Office representing the head of the Texas Education Agency, Michael Williams. Are you going to keep your voice up because this is not the most modern equipment I think? Certainly not. Driver education at privately owned and operated driver education schools is not a service program or activity of the TEA. Because Title II of the ADA and Section 504 of the Rehabilitation Act require a service program or activity of a public entity, plaintiffs fail to state a valid Title II claim or Section 504 Rehab Act claim. And they also lack standing to bring those claims because their injuries are not fairly traceable to the TEA, but are instead traceable to the driving schools themselves. And their injuries are not redressable in this lawsuit against the TEA's commissioner. Now this service program or activity of a public entity issue is important in this case, not only because if our view of the issue is correct, it resolves the case in our favor, but it's also important to the state and to the ADA and Section 504 jurisprudence more largely. Because this lawsuit represents an attempt to establish that a state agency can have an independent duty under Title II of the ADA or Section 504 to identify, adjudicate, and then eradicate ADA violations at private third-party businesses. But you're relying on the private business to furnish the certificate that the state requires before someone can get a driver's license. So how are these deaf children ever going to get a certificate if they can't understand what's being taught and their reading skills are poor? Are you relying on just the parent component that they can get a certificate if the parent teaches them to drive and to pass the test? No, no, we're not. And we understand that the plaintiffs, by definition, don't qualify for the parent-taught course. And so that aspect of this issue is not at issue here. And we're not unsympathetic to the plight of these children either, but what they can do and what they have done in this proceeding is they can pursue an action under Title III against the driving schools. Those driving schools have an obligation under Title III to provide a reasonable accommodation to these disabled students. And indeed, when the plaintiffs in this case pursued an action in the earlier iterations of this case, they named a couple of driving schools, and there's an affidavit in the record from one of the driving school owners in which he says, I'm sorry, I didn't realize, in effect, I'm not quoting verbatim here, I'm sorry, I didn't realize I had this obligation. As soon as I became available of it, or as soon as I became aware of it, I realized that I need to comply with it, and I will always provide reasonable accommodation in the future. Now, that's not the most efficient remedy for plaintiffs. I understand they would prefer a statewide remedy, but the problem with that is there are very far-reaching and serious implications for that unprecedented remedy. You're saying that any aggrieved person, because they cannot get, because they cannot challenge the discrimination against them, can do so under Title III. In other words, these individuals who claim they're discriminated against on the basis of their ability have a remedy. That's absolutely correct. And there's no statewide remedy, well, no statewide imposition of the Act on all driving schools, which is what they're seeking here. Right. They're seeking a mechanism through which they can use state regulatory and enforcement mechanisms to go out and enforce federal legal obligations, compliance with the ADA, by private third parties. How would an individual who is being discriminated against on the basis of ability be better off under Title II remedy that they're seeking here, as opposed to a Title III remedy which permits them to file individual claims? How would that individual be better off? An individual would not be better off, Your Honor. Wouldn't all of the individuals be better off because there's a statewide umbrella? Yes. And it's like a class action. You don't have to take each one, each driving school. I think you've articulated plaintiffs' position and likely their motivation for styling this not only as a class action, but also seeking to obtain a remedy from the TEA, an agency with statewide reach, as opposed to suing individual driving schools. Whereas they'd get attorney's fees as opposed to if they sued the individual driving schools, they wouldn't be entitled to attorney's fees. I'm not sure if there's an attorney's fees under Title III, not something I have spent time considering. That's because you work for the state. That's correct. My days of thinking about that are over, at least unless we're on the wrong side of it. You've recovered. So there are regulations, DOJ Technical Assistance Manual and U.S. Attorney General regulations that address this topic. But the parties kind of speak past each other about the import of those regulations. And we can say and do say that the regulations make clear that if you're a licensing or regulating entity, then you are not responsible for the ADA violations of a private party that you merely license or regulate. And their response is, well, it's your program, so you are, so you are. So really the regulations and DOJ Technical Assistance Manual, in a sense, kind of refer back to the same core issue, which is how do we figure out what is a service program or activity of a public entity. So I would, in exploring this issue, I would propose sort of a two-step approach. The first is to look at some examples of things that are and are not services, programs, or activities of a public entity, at least that we see in prior cases. And the second is to look a little closer at plaintiffs' proposed solution and some of the repercussions of it. So first, if we look at things that are not state programs, or at least that other courts have found to be not state programs, we see things like comprehensive regulatory scheme covering private taxi cabs. But because the taxi cabs are owned and operated privately, notwithstanding the massive amount of regulation, very pervasive and covering all kinds of different minute topics with regard to how these taxis operate, that is not a public service program or activity of a public entity. Same with licensing and regulation of liquor sales and restaurants. That's the Tyler case. The taxi cab cases are the Knoll and Baskill cases we cite in our opening brief. And then, interestingly, there's the Reeves case from Colorado in which we have basically public transportation, buses going to and from privately run gambling and ski resorts, but the buses are privately owned and operated. And so, again, not a public entity service program or activity. And so the concepts that we can glean from these cases are the following. It's not the amount of regulation that matters, not the volume or how thick the regulations are if you print them out and stack them up. And it's not whether there are inspections or involvement, heavy involvement by the agency, because there were inspections and pretty extensive involvement by the regulating agency in these cases. What you really see is that it's licensing and regulation of sometimes preexisting private party enterprises or activities. Well, isn't it distinguishable? All the examples you gave are optional and don't involve anybody, but large numbers or percentages. But for people to drive a car, particularly in Texas, at 18 to 25, that is about as pervasive and far-reaching as anything you can get and distinguishable from buses going to gambling and things like that. Well, Judge Weiner, I think there's two aspects to your question. One is that this sort of state-mandated aspect of it, and the second is that these regulations are pervasive in that they reach out into different areas of life. I'm just saying that for anybody in this day and age in the state of Texas to not be able to drive a car between 18 and 24 is highly distinguishable from taking a bus to a gambling place or even catching a taxi. It's factually distinguishable, but where's the legal principle that makes it distinguishable? That's right. It is distinguishable, but it doesn't appear to make a difference under the case law, nor should it. Because take, for instance, well, I invite the Court to – I did this a couple of days ago on Westlaw, on these electronic research services. You can call up the Texas Occupations Code, and you sort of expand it and click on it, and there are listed – I don't know how many – quite a few over a screen full of different occupations that have licensing and education requirements. So one example in our brief is beauty school. So if you want to be a cosmetologist in Texas, you have to go and get a license to be a cosmetologist. And to do that, you have to perform certain – or achieve certain educational certification, and that requires you to go to a school that's also licensed to give you that education. You have to get what amounts to is a course completion certificate. So now, if plaintiffs' view of this case were true, then every one of those agencies has a state-mandated licensing requirement that affects somebody's ability to make a living and do all these things that driver's licenses also do. But yet every single one of those agencies that's in charge of that licensing would now have an independent obligation to go out and, again, as I said, identify, adjudicate, and eradicate ADA violations at those schools. Now, plaintiffs say, wait a second, we're not necessarily saying that we're requiring this commandeering of the state regulatory mechanism. We're not saying that you have to pass this 24th-inch-thick binder full of regulations about ADA compliance. The problem with that point is that what plaintiffs are trying to do is sort of the nose of the camel under the tent. Once we have a duty, then like in this case, the TEA voluntarily has a little line on an affidavit for an application for one of these schools. And it requires the affiant to attest that they're going to try their best to comply with federal law. But now that is not good enough. That step that the TEA sort of undertook voluntarily is not good enough. So if there is an independent duty, then there can be a lawsuit to say, well, you need to do more. You need to adopt further regulations. And then this tasks the TEA, a state regulatory entity that develops curriculum for schools, now has to be able to know, okay, somebody's complained about an ADA violation or Section 504 violation. Are they really disabled? Is that a disability that they're complaining about? And was there a reasonable accommodation? Can one be made? And what sort of regulations should be passed to make sure that those accommodations occur? And, you know, how do we police that? How often do we have to inspect? What sort of, you know, fines and mechanisms can we put in place? And the simple fact is TEA couldn't do that. All of these other agencies in the Texas Occupations Code couldn't do that just as a practical matter. And more fundamentally, TEA has not been charged by the legislature to do that. We don't have a mandate from the legislature to go out and do this. And without that mandate, for good reason, we don't do it. Now, we can voluntarily try to do some things like we've done, but that's very different than a lawsuit. Look at the list in your brief and in the evidence of all of the involvement that TEA has with these driving schools, all the requirements and the frequency of the annual renewals, all of that. It's very little to put a line in. And by the way, you have to accommodate those that are hearing impaired under the ADA. Well, there's a difference between putting that in and then being required or ordered to put that in and then enforce it. And that's really what's at issue here is whether the TEA must put that in its regulations. If the TEA has opted to closely supervise, regulate, enforce, and relicense on all of these other things that it requires, how can it say, but we're not going to do anything about the hearing impaired? Well, I invite Your Honor to look at the statutes governing these other professionals, the cosmetology statute, for instance. It's very similar in scope. Well, they're not before us. We're talking about the driver's license, which I've already distinguished from all these other things. I can see my time is about up. Quickly, what's the basis of the fee? What's the justification for charging these driving schools a fee? The statute provides that there's a fee that covers sort of administrative expenses. This isn't a revenue generated. It's not a lottery. It's not like a taxi fee or a liquor license tax. No, it's a fee that is commensurate with the costs to administer the licensing program. So I think the amicus in their brief said there's something like $2 million in one year of money generated. But when you think about a state the size of Texas and all of these schools, it's not much. Contrast that with revenues from a state lottery, for instance. OK, Mr. Farrar. Thank you very much. Mr. Saunders, we'll hear from you. May it please the court. My name is Joe Sanders, and I represent the plaintiffs in this case who are themselves representatives of classes of individuals who are discriminated against based on their disability in Texas. By this lawsuit, the plaintiff's appellees are profoundly deaf yet fully capable of driving a car in compliance with the laws of Texas. However, they cannot get a driver's license because they have been denied access to the only program available to anyone like them to obtain the necessary course completion certificate and the preceding education that the legislature requires they must get to get a license. What kind of reform would the schools have to engage in to make this accommodation? Very modest reform. There are examples that exist in other states, for example. New Mexico has a very similar statutory grant to its agency. Put very simply, if a hearing disabled person shows up to the school, they get 14 days notice, an interpreter is provided. There's even an example in Texas. The procedure for driver's license issuance in Texas is if you're under 25 seeking a first driver's license, you have to go to the school. You have to go to the school because you have to get the golden ticket. That is the course completion certificate. I understand, but are you saying that the only thing that would be required for these schools to do is to provide someone, an interpreter, who could interpret for the hearing impaired person? I'm not saying that. In fact, we're not seeking any specific form of relief. What we're seeking is first a declaration that the agency itself has an independent obligation as someone who designs, administers a program, service, or activity or confers a benefit. Then it goes from there. In other words, if we decide that it is a program, service, or activity, then you have them just as you would have anyone else under the complete umbrella of the ADA, and they would be obligated to provide affirmative relief and make accommodations as any public agency would to accommodate these people. I'm asking you, what kind of accommodation would that require for an agency to comply with the ADA assuming they were under it? It could vary. One option is an interpreter. That's precisely what the DPS provides once you show up with your course completion certificate and you take your driver exam to get your license. It could also be a technological advancement. It could be an online course that's offered that is interpreted in American Sign Language and captioned. It could also be further revised with technology. There exists an app on my phone that I can buy for $4.99. When I type into it, it will give me sign language. There's also an app on my phone that when I dictate to it, it will turn it into written words. If you put those two things together, you have the ability to speak and have on a monitor sitting over there someone signing it. The accommodations that could be implemented here are quite modest. If your client had your phone with the app on it, why couldn't they pass the test? It's not my client's responsibility to ensure that the program is accessible. That's the question. Not are you responsible for providing phones, but if they had this app, would they be capable without a real-life interpreter to listen to the course and pass the test? They would certainly be able to listen to the course. If by test you mean the test at the end of the driver education course, if that test is written in English, they can't understand it. What if you said there was an app that would translate or add the sign language to the English? If that person had the exam in her hand and typed the exam questions into the app, it would sign a yes. Of course, it would take probably five hours to take a 30-minute exam. You couldn't just scan it? Scan the written English into whatever you're talking about and the sign language would appear? Precisely. I think all these go to the point of the accommodations that are required to make this accessible are quite modest. The thing that concerns me about the case that you have is the unintended consequences of ruling in your favor. In other words, it would be very simple to just say all driver education will comply with the ADA, but then where does that lead? That leads to enforcement. That leads into a completely new department within the agency. That leads to a driver's education program trying to implement ADA regulations they have no expertise for, and it spreads across the state of Texas. It almost puts on the TEA an obligation that consumes as much time and money as their basic program does. It's just these unintended consequences that we can't see out there of what we do. That's very important to me as a judge. I don't want to make a very good ruling on a particular case and then it creates havoc. I understand your point, Your Honor. Ultimately, we're not trying to turn the TEA into the ADA police to ensure that the private driving schools are complying with the ADA. We are calling the ADA police on the TEA. One of the options for the TEA to fulfill its responsibility could be to beef up its own regulations of its driving schools and say, driving school, before I issue you a license, I'm going to come to your premises. I'm going to inspect your space. I'm going to inspect your instructional materials. I'm going to ensure that you're complying. That's precisely what they do now. In fact, before a license is issued today, someone for the TEA physically goes to the premises and makes sure that it's— if they're doing today what you would have them do under a court order, where is the injury? They're not doing anything to ensure that the hearing disabled—my hearing disabled clients are being accommodated. They might be doing something to ensure that a wheelchair-bound person is being accommodated. For example, they may be going to the premises to ensure that the school itself has ramps so that someone who is wheelchair-bound can get in and get the instruction. But they are, by their own admission, not doing anything upon their inspection. But they have not been declared a service program or activity, the TEA itself. No, and that's precisely what— What they're doing is voluntarily. Once they are determined to be a program, service, or activity, they come within the umbrella of the ADA itself so that neither you nor the court has any control of where that leads because it gives everybody the right to—I mean, every disabled person—I mean, the right to have the full umbrella of all of the rights provided by the ADA imposed against the TEA. I mean, you can't just limit it, as you seem to suggest that would be appropriate. I don't mean to suggest any limitation. In fact, if it is determined that the driver education program is a program, service, or activity of the agency, then that explicitly triggers a regulation under 35160 that says you've got to provide auxiliary aids. And that anybody can sue them for it. I mean, any aggrieved person can sue—I mean, pardon me—sue for the particular accommodations they need. I mean, it just creates a lot. And then the burden to impose that is the TEA, whose primary job, of course, is driver education. But a template— Doesn't Judge Jolly's question go back to Congress and the ADA, not to how it affects the TEA or the driving schools? Precisely. And we're not just also talking about— Well, it doesn't to me, I can tell you that. Because as a judge, I have a responsibility to try to understand the unintended consequences to know whether something is reasonable or unreasonable. Is there a physical driving course? Like, does the applicant have to physically get in with an instructor and drive a car to show they can drive? For those under 18 years of age. If you're 18 or over, you only have to take a classroom portion. So it wouldn't affect these people? Well, you've chosen 18 to 25. We've actually chosen 16 to 24. All right, so what if someone's a paralegal? Does the driving school now have to provide a car that's equipped for a paraplegic to drive? Yes, precisely. They do not, because they're not— Right. They do not under law. They can do it voluntarily. No, if the ADA is applicable. If the ADA is applicable. If he wins. If he wins, that's true. Then every paraplegic, if they can't bring their own car, they have to—the driving school would have to provide a car that would be modified so that that person could physically drive it. The TEA would have to ensure that the program in its entirety is accessible to that person. That may not mean that every single outpost of a driving school has a car equipped for that purpose. It could mean that one in a certain per capita population area. That's the issue, and that's really the distinction between the Title II responsibility of an agency and the Title III responsibility of a private entity operating a public accommodation. We view the program in its entirety in respect to Title II. We don't mandate that every single outpost be in compliance under Title II. Not now, but later. You can't guarantee that later. That would be the consequence of any kind of ruling once you've declared TEA to be a program that serves that duty. The other thing I wanted to ask you is can you give me a principle that would preclude this decision that you're asking for from being put to all the other civil rights organizations and agencies of the federal government to have every state agency create its own enforcement mechanism for race discrimination, sex discrimination, EPA, all the other myriad laws out there of the federal government? Yes, I think there's two standards. One, is the person seeking a relationship with the school seeking access to the program? Let me make this distinction. Suppose in their brief it's mentioned that, well, now we'll have to start policing the employment practices against federal law. If someone applies to become a receptionist or instructor or an employee of a driving school and has, in that employment, been discriminated against because of their race or sex or national origin, that person is seeking private employment. That person is not seeking access to a government program. And so under our theory, no, that person, those laws would not need to be enforced and made sure that they're in compliance with. But if someone is seeking access to the program, because ultimately at the end of the day, the requirement for this certificate started with the Texas legislature. And the state of Texas is saying they have no obligation to make the certificate accessible to hearing, disabled people. Excuse me, I'm sorry to keep interrupting, but if it's declared to be a service activity or a program, there is no way that you can limit the principle that you're asserting to accessibility. I mean, after they have been accessed and been put into the program, then they have all this other panoply of rights under the ADA. Once you declare them under the ADA, they're in for a nickel, they're in for a dollar. You mean the schools? The schools. Yes. No, I don't mean the schools. I mean the TEA. The TEA. And there exists a template for this. The lottery, I think, provides the best example or the most analogous situation here. Here you have a state-created system, the lottery system, and a portion of that program is farmed out to private businesses. You know, retail locations, grocery stores, and things like that. The purpose they serve in the program is to actually conduct the transaction. Okay, so they are licensed, they must make application, they must pass a background check, all the things that taxicab companies and liquor stores must do. But what distinguishes the lottery example and our example from those cases are three things. One, the participation is mandatory. There is no law that says you must play the lottery. There is no law that says you must patronize a liquor store. There is no law that says you must ride in a taxicab. There is in Texas a law that says if you're under 25 and you're seeking a first driver's license, you must go to these schools. Yeah, but what you have just described is a factual distinction and not a distinction in principle, legal principle. It is. Because the principle you want is, as I understand it, is that the TEA as an agency of the state is obligated to enforce, is a service within the ADA, and it's obligated to enforce the ADA in all of its aspects. Now, any others? I don't see how that is a distinguishing principle from what you've said, accessibility. I mean, accessibility is just a minor part of it. Once you get, as you say, the 10, your nose under the 10, I mean, you're there for everything. But again, the template exists not only because the participation is mandatory, but also because the transaction involves the state. If you show up to a 7-Eleven to buy a lottery ticket, you are there to procure a government record that if it turns out to be a winning lottery ticket, you can present to the state for payment. How did you distinguish your situation from NOAA and the limousine and taxi licensing program in New York? Again, the same distinctions apply. One, no one is required to take a taxi like they are required to participate in driver education. Two, when I step into a taxi cab, I'm there for a ride. I'm not there to get a government record that I must present in order to exercise a right that I'm entitled to. And three, the taxi licensing company is only issuing licenses, and I think that's important. In all the pure licensing examples, whether the regulation is extensive or modest, the only thing that the agency issues at the end of the day is a license. In this example, not only are the driving schools issued a license, they're also given curriculum. They're also given instructional materials. They're also given the course completion certificates. Just like in the lottery example, the retailers are given the lottery machines, the paper to print the tickets on, the tickets themselves, which again culminate in a transaction with the state. And the management of those records, the course completion certificate, is much like you would expect for a lottery ticket. They are tracked to a T. They are uniquely numbered. If someone is found to be distributing the course completion certificates unlawfully, they can be subject to a five-year felony sentence. If the driving school discovers that one has gone missing, they must immediately report it to the TEA, conduct an investigation, and report the findings of the investigation and tell the TEA why it won't happen again. So the driving schools themselves are administering at least the issuance of the course completion certificate, which is really all that matters. The transportation code doesn't say you must attend driver education school. The transportation code says you must obtain a course completion certificate. So you don't, oh, okay, you have to go to the course. You have to go to the course. You have to go to the course. But what I'm suggesting is the issuance of the certificate itself is on behalf of the TEA. The TEA issues it to the driving schools. It's uniquely numbered. It's tracked. It's monitored, just like you might expect a lottery ticket. It's handed out by the driving schools. But the TEA's regulations themselves call it a government record. All right, what if the state decides we're not doing this anymore? We're not going to be bound by ADA. It's way too much administrative hassle. Forget the certificate. You don't have to go to a school. Like here, you can go to driver's lab if your parents want to pay for it, or your boyfriend can teach you to drive. Then you show up, you take the test, and you get your license. What if they do that? You still have no remedy. But, again, you're not denied access to a service program or activity. Yeah, but you're still not going to get your driver's license. Well, if you can educate yourself enough to show up to the DPS and pass the exam, you will. It's not unlike you'd have to pay for the interpreter. You'd have to do all the things that you would still have to do if the certificate was still required. You could pay for your interpreter, no? You could, but that is unequal treatment to someone who's disabled, and that's not permitted by the law. See, I think the better analogy is if we normalize on education. Many of the students in this room have recently taken a law school admissions exam. Some of the people in this room have recently taken a bar exam. For both of those exams, there exist private education programs. The Bar Review, the Princeton Review, those kinds of things. Those are not programs, activities, or services of any state agency. If they were regulated, because maybe some agency decides, I want to make sure that patrons of these businesses aren't defrauded or things. How do your clients take bar exams? None of my clients are eligible to sit for the bar exam. Well, when they grow up, if they want to go to law school, how would they pass a bar exam? I don't know. It could be that the scheme exists just like the DPS in Texas right now. If I have the course completion certificate in my hand and I'm deaf, the DPS, if I ask for it, will provide me an interpreter. Let me ask, is the licensing of lawyers a program, service, or activity within the meaning of ADA? I think that would necessarily require an examination of whether the BL, you know, the Board of Law Examiners is a public entity. I mean, is there any way you could distinguish and say the argument that you're making would be applied to lawyers as well? If, in fact, yes. Or doctors. Precisely, but not for a preparatory course. See, like I'm saying, there exists in the market private businesses that just, they're open for business to teach students the material they need to learn to ultimately pass the test. That's sort of my bar review example, my LSAT review example. Participation in those is completely voluntary. It's not mandatory. When I show up to take my bar review course, I'm there to just try to learn so that when I sit for the bar exam I can pass. May I finish? Sure. But I'm certainly not there to get a required government record. And so I think in those instances, if an agency were to regulate a bar review course and do nothing more than issue a license, then I don't think they have any independent Title II or Rehabilitation Act obligation. But I think for the reasons I've stated here, ours is different, and for those reasons we ask that the district court's opinion be affirmed. Okay. Mr. Sanders, thank you for a good argument. Mr. Sarra, we'll hear from you now. Sorry. So if you're required to have a certificate of graduation from an accredited law school in order to get a bar license, then we're right back where we just were. Judge Schall, you're exactly right. We can parse the cases, and we've done our best, both sides have done our best in our briefing, and we can distinguish them. We can distinguish the lottery cases because the lottery is a money generator and because these lottery outlets are acting under a contractual or an agent relationship. There's an actual legal connection between people providing the lottery tickets to the public and the state agency that makes them different, that also distinguishes a lot of these other cases that plaintiffs and their amicus cite in their brief for things like prison benefits, other kinds of public benefits, public sidewalks where there's a hired contractor. Doesn't that distinction answer Judge Jolly's question about the unforeseen consequences? They are all distinguishable. This is a unique thing, the ability of someone to obtain a driver's license in today's society and in a state as large as Texas. All of these other things, whether it's massages or taxis or whatever, are distinguishable. Well, they might be factually different, but they're not distinguishable in that people can't pursue a living. You can't pursue a living as a lawyer unless you go through the licensing scheme to be a lawyer. What about the percentages of lawyers in the country to the percentages of drivers? Well, if we take that principle to tweak or adjust the text of the ADA and the Rehabilitation Act, then what we're introducing is a flood of unintended consequences. We're introducing a flood of, okay, here we have fairly modest reforms. Well, that counsels against a remarkable and unprecedented decision from this court establishing a new duty under the ADA. It counsels in favor of resolving this in different ways, outside the courtroom maybe or creatively thinking. But once we've established a duty, you have to comply with the duty, and that means in for a nickel, in for a dollar. So we, the TEA, provide some regulations, and then somebody comes along and says, oh, those regulations don't go far enough for my disability. My disability is whatever, severe migraines or my disability. Then we've got to figure out, is that a disability? What do we have to do to comply with that? Then all of a sudden, maybe we're facing lawsuits from public school students. Parents of public school students are saying, what are you doing with all of your money? You're taking all of your money that you're supposed to be spending developing curriculum for public schools, and you're spending it on ADA compliance of private businesses across the state of Texas. Is there any statutory definition of service program or activity? There isn't in the ADA. There's an unhelpful sort of circular definition in Section 504 of the Rehab Act, which just says it's all of the operations of the agency. But that begs the question, are these the operations of the agency? Are these the operations of the third party? And so that's why the statute, some of the cases from this court and bank cases that address this topic, really don't hit on this kind of unique issue here in this case, and why I think the way to crack this nut is to look at, like I said, survey the cases and the decisions that show what is and isn't a service program or activity of a public entity, and then to think about the unintended consequences of what a decision adopting a duty like this, like plaintiff's contraband, would be. Those unintended consequences would be very far reaching and would have a significant intrusion into state sovereignty as well. With that, I'll be happy to give it away. Thank you.